IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| OLDENDORFF CARRIERS GMBH & CO., KG | § § § | |
| | § | C.A. NO. C-12-074 |
| v. | § | |
| | § | Admiralty Fed. R. Civ. P. 9(h) |
| GRAND CHINA SHIPPING (HONG KONG) CO., LTD., ET AL. | § § | |

**MEMORANDUM AND RECOMMENDATION
TO GRANT DEFENDANTS'
AMENDED MOTION TO DISMISS AND TO VACATE ATTACHMENT**

This is an admiralty action filed pursuant to Supplemental Rule B of the Federal Rules of Civil Procedure by Plaintiff Oldendorff Carriers GmbH & Co., KG ("Oldendorff"). Pending is an Amended Motion to Dismiss and Vacate Attachment filed by Defendants Offshore Heavy Transport AS ("OHT") and OHT Eagle AS ("OHT Eagle"). (D.E. 56). OHT and OHT Eagle contend that Plaintiff has failed to allege sufficient facts to establish a plausible claim that they should be subject to alter ego liability for the conduct of Defendants Grand China Shipping (Hong Kong) Co., Ltd.'s ("GCS") and Grand China Logistics Holding (Group) Co., Ltd. ("GCL"). Oldendorff has filed a response opposing dismissal. (D.E. 58). Defendants OHT and OHT Eagle have countered with a reply. (D.E. 62). For the following reasons, it is respectfully recommended that Defendants' motion be granted.

**I. JURISDICTION**

This Court has jurisdiction over maritime claims pursuant to 28 U.S.C. § 1333.

**II. PLAINTIFF'S ALLEGATIONS**

On August 5, 2008, Defendant GCS entered into an agreement with Korea Line Corporation ("KLC") to time charter the vessel M/V K Daphne ("Daphne"). (D.E. 1, at 3). GCS

later sub-chartered the Daphne to Plaintiff Oldendorff on December 20, 2010.  Id.  Pursuant to the sub-charter, Oldendorff then instructed the vessel to proceed to Narvik, Norway on February 9, 2011 in order to fulfill a freighting contract with a Saudi corporation.  Id.

Before the Daphne was able to execute Oldendorff's orders, however, KLC determined that GCS breached their charter contract by failing to make hire payments.  Id.  On February 23, 2011, KLC withdrew the Daphne from GCS's service and Oldendorff was no longer able to use the vessel.  Id.  As a consequence, Oldendorff was forced to arrange for a replacement vessel to complete the cargo shipping order at a cost of $1,044,503.00.  Id. at 4.  At that time, GCS owed Oldendorff an additional $1,665,916.04 for other non-reimbursed expenses and charges.  Id.

### III.  PROCEDURAL BACKGROUND

On July 6, 2011, Oldendorff commenced an arbitration proceeding against GCS in London pursuant to the terms of their sub-charter contract.  Id. at 5.  In order to obtain security for that proceeding, Oldendorff instituted this action against GCS on March 7, 2012, pursuant to Supplemental Rule B of the Federal Rules of Civil Procedure as well as the Federal Arbitration Act, 9 U.S.C. §§ 4, 8, in aid of maritime arbitration.  Id.  Oldendorff claims that GCS breached their sub-charter contract by failing to meet its contractual obligations to KLC.  Id. at 4, 17.  After including interest and attorneys fees, the complaint asserted a recoverable amount totaling $3,470,551.95.  Id. at 5, 14.  Oldendorff also sought to hold GCL, OHT, and OHT Eagle liable for GCS's breach on the basis that an alter ego relationship existed between each of these corporations.  Id. at 10-12.

Simultaneously, Oldendorff submitted a motion to seize the OHT Eagle, which was then within the territorial jurisdiction of this Court.  (D.E. 3).  This motion was granted on March 8,

2012 and the OHT Eagle was seized.  (D.E. 7).  OHT posted bond on March 15, 2012, (D.E. 16), and Plaintiff consented to the release of the vessel.  (D.E. 17).

Defendants OHT and OHT Eagle filed their answers on April 9, 2012.  (D.E. 23, 24).  On April 20, 2012, they submitted a motion to dismiss and vacate attachment in accordance with Rule 12(b)(6) of the Federal Rules of Civil Procedure and Supplemental Admiralty Rule E(4)(f).  (D.E. 27).  The parties were granted an opportunity to conduct jurisdictional discovery and to amend their pleadings.  (D.E. 48).  Plaintiff filed an amended complaint on December 31, 2012.  (D.E. 51).  Defendants OHT and OHT Eagle filed their answers on February 4, 2013, (D.E. 54; D.E. 55), and on February 4, 2013, they submitted an amended motion to dismiss and motion vacate attachment.  (D.E. 56).  On February 25, 2013, Plaintiff filed a response in opposition.  (D.E. 58).  Defendants filed a reply on March 8, 2013.  (D.E. 62).  A hearing regarding the motion was held on March 19, 2013.

## IV.  DISCUSSION

Defendants have invoked both Rule E(4)(f) and Rule 12(b)(6), urging for vacatur of the attachment order as well as for the dismissal of the action against them.  (D.E. 56).  A motion to dismiss pursuant to Rule 12 is to be distinguished from a motion to vacate an attachment pursuant to Rule E(4)(f).  Although Rule E(4)(f) establishes the procedure for releasing seized property from an arrest or attachment, it does not provide for dismissal of the action.  Chiquita Int'l Ltd. v. MV Bosse, 518 F. Supp. 2d 589, 596 (S.D.N.Y. 2007); see also Vitol, S.A. v. Capri Marine, Ltd., No. MJG-09-3430, 2011 WL 5577618, at *2 (D. Md. Aug. 22, 2011) (unpublished) ("it is at least theoretically possible that a Complaint adequate to withstand a Rule 12(b)(6) motion may, nevertheless, not be adequate to avoid the vacatur of an attachment").

3

However, because attachment forms the jurisdictional basis in this action, Defendants are entitled to dismissal if they show that attachment should be vacated. See Sembawang Shipyard, Ltd. v. Charger, Inc., 955 F.2d 983, 987 (5th Cir. 1992) (explaining that Rule B provides for a *quasi in rem* proceeding, in which the plaintiff's claim is against the named person but because that person cannot be found in the district, the plaintiff can proceed against the thing); Great Eastern Shipping Co. Ltd. v. Maritime Tankers & Shipping Co. Int'l, 631 F. Supp. 2d 392, 396 (S.D.N.Y. 2009) ("Absent a Rule B attachment pursuant to the Court's admiralty jurisdiction, there is no independent basis for jurisdiction under the Federal Arbitration Act.") (citing Zurich Ins. Co. v. Ennia Gen. Ins. Co., 882 F. Supp. 1438, 1439 (S.D.N.Y. 1995)).

A.  **Standard For A Motion To Vacate Pursuant To Rule E Of The Supplemental Rules For Admiralty And Maritime Procedure.**

Supplemental Rule E provides for release of a vessel from arrest or attachment in a maritime proceeding:

> Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules.

Fed. R. Civ. P. Supp. E(4)(f). While Plaintiff carries the burden of showing why the arrest should not be vacated, the procedure "is not intended to resolve definitively the dispute between the parties, but only to make a preliminary determination whether there were reasonable grounds for issuing the arrest warrant." Salazar v. Atlantic Sun, 881 F.2d 73, 79 (3d Cir. 1989); see also Naftomar Shipping & Trading Co. v. KMA Int'l S.A., No. V-11-2, 2011 WL 888951, at *3 (S.D. Tex. Mar. 10, 2011) (unpublished) (applying "reasonable grounds/probable cause" standard for Rule E motion to vacate, explaining that Rule E(4)(f) determinations establish "'that it is *likely*'

4

that the alleged facts are true.") (quoting Wajilam Exports (Singapore) Pte. Ltd. v. ATL Shipping Ltd., 475 F. Supp. 2d 275, 280 (S.D.N.Y. 2006)) (emphasis in original). Accordingly, Plaintiff can only survive a Rule E motion to vacate by showing by a preponderance of evidence that it is entitled to attachment. Vinmar Int'l Ltd. v. M/T Clipper MAKISHIO, No. H-09-3829, 2009 WL 6567104, at *1 (S.D. Tex. Dec. 9, 2009) (unpublished) (citing Seatrade Group N.V. v. 6,785.5 Tons of Cement, No. H–05–2771, 2005 WL 3878026, at *2 (S.D. Tex. Dec. 6, 2005) (unpublished)).

Pursuant to Rule E(4)(f), once a defendant moves to vacate an attachment, "'a district court must [grant it] if the plaintiff fails to sustain his burden of showing that he has satisfied the requirements of Rule B and Rule E.'" Naftomar Shipping & Trading, 2011 WL 888951, at *2 (citation omitted). To support the attachment of a vessel pursuant to Rule B, a plaintiff must show that: "(1) [it] has a valid *prima facie* admiralty claim against the defendant; (2) the defendant cannot be found within the district; (3) the defendant's property may be found within the district; and (4) there is no statutory or maritime law bar to the attachment."[1] Id. (citing Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434, 445 (2d Cir. 2006), overruled on other grounds by Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd., 585 F.3d 58, 61 (2d Cir. 2009)).

**B.     Plaintiff Has Not Shown That It Is Entitled To Attachment.**

Here, the parties have engaged in extensive discovery on the jurisdictional question of whether Plaintiff can establish an alter ego relationship sufficient to hold OHT and OHT Eagle

---

[1] Rule B(1)(a) of the Supplemental Rules for Admiralty and Maritime Claims provides, in relevant part: "If a defendant is not found within the district when a verified complaint praying for attachment ... [is] filed, a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property–up to the amount sued for–in the hands of garnishees named in the process."

5

liable for GCS's obligations. Based on the evidence revealed through discovery, it is apparent that Plaintiff cannot sustain its burden of stating a *prima facie* admiralty claim against Defendants to the extent necessary to justify the continued attachment of the M/V Eagle.

This Court has explained that "'[t]o state a prima facie claim for alter ego liability, plaintiffs must make specific factual allegations from which alter ego status can be inferred; conclusory allegations are insufficient.'" White Rosebay Shipping S.A. v. HNA Group Co. Ltd., No. 2:12-CV-096, 2013 WL 441014, at *3 (S.D. Tex. Feb. 5, 2013) (unpublished) (quoting Naftomar Shipping & Trading, 2011 WL 888951, at *5). Federal courts sitting in admiralty "can pierce the corporate veil of a corporation in order to reach the 'alter egos' of the corporate defendant directly involved." Talen's Landing, Inc. v. M/V Venture, II, 656 F.2d 1157, 1160 (5th Cir. Unit A Sept. 1981) (citing Swift & Co. Packers v. Compania Colombiana Del Caribe S.A., 339 U.S. 684 (1950)). "Under the alter ego doctrine, a corporation may be bound by an agreement entered into by its subsidiary regardless of the agreement's structure or the subsidiary's attempts to bind itself alone to its terms, 'when their conduct demonstrates a virtual abandonment of separateness.'" Bridas S.A.P.I.C. v. Gov't of Turkmenistan (Bridas I), 345 F.3d 347, 358-59 (5th Cir. 2003) (citation omitted). Nevertheless, "[t]he alter ego doctrine, like all variations of piercing the corporate veil doctrine, is reserved for exceptional cases." Bridas S.A.P.I.C. v. Gov't of Turkmenistan (Bridas II), 447 F.3d 411, 416 (5th Cir. 2006) (citation omitted). Federal common law supplies the substantive law governing the resolution of an alter ego claim in the context of a maritime action. Ost-West-Handel Bruno Bischoff GmbH v. Project Asia Line, Inc., 160 F.3d 170, 174 (4th Cir. 1998) (citations omitted); Chan v. Society Expeditions, Inc., 123 F.3d 1287, 1294 (9th Cir. 1997) (citation omitted); see also Century

Hotels v. United States, 952 F.2d 107, 110 n.4 (5th Cir. 1992) ("State and federal alter ego tests are essentially the same. Our non-diversity alter ego cases rarely state whether a state or federal standard controls, and apply state and federal cases interchangeably.") (citation omitted).

 Generally, the corporate veil is pierced "only if (1) the owner exercised complete control over the corporation with respect to the transaction at issue and (2) such control was used to commit a fraud or wrong that injured the party seeking to pierce the veil." Bridas I, 345 F.3d at 359 (citing American Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 134 (2d Cir. 1997)). Although the Fifth Circuit has not addressed whether federal common law permits a subsidiary to be held liable for the parent corporation's obligations, the court has indicated that there is little conceptual difference between the test for forward as opposed to reverse veil piercing. See Chao v. Occupational Safety & Health Review Comm'n, 401 F.3d 355, 364 (5th Cir. 2005) (explaining that "'[t]his slight variation is of no consequence, however, because the end result under both views is the same–two separate entities merge into one for liability purposes'") (quoting Maiz v. Virani, 311 F.3d 334, 346 n.11 (5th Cir. 2002)).

 In American Fuel, which the Fifth Circuit adopted as its own two-prong approach to corporate veil piercing issues in Bridas I, 345 F.3d at 359, the Second Circuit recognized that "'[w]hile complete domination of the corporation is the key to piercing the corporate veil, ... such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward [the party seeking piercing] is required.'" 122 F.3d at 134 (citation omitted). The Fifth Circuit has subsequently explained that this injustice requirement can be met by showing fraud, an illegal act, or a misuse of the corporate form. Bridas II, 447 F.3d at 416-17 (citing In re Sims, 994 F.2d 210, 217-18 (5th Cir. 1993); United States v. Jon-T Chems., Inc., 768 F.2d 686 (5th

Cir. 1985); Edwards Co. v. Monogram Indus., Inc., 730 F.2d 977, 984 (5th Cir. 1984)).

Here, Plaintiff alleges that Defendants constitute a single business enterprise pursuing their business objectives through nominally separate business structures, all of which are dominated and controlled by HNA, a parent company of GCL, GCS, OHT and OHT Eagle. Specifically, it asserts that HNA controlled these subsidiaries through GCL, which owns GCS and also acquired a 60 percent ownership interest in OHT in September 2010. OHT wholly owns OHT Eagle. Accordingly, Plaintiff seeks to hold OHT and OHT Eagle liable for GCS's obligations as subsidiaries of HNA and GCL. Because Plaintiff's claim relies on a combination of forward and reverse veil piercing theories, it must first show that HNA is liable for GCS's obligations and then show that OHT and OHT Eagle, in turn, are liable for HNA's obligations.

Plaintiff's alter ego theory rests on the following allegations: (1) HNA is the funding conduit for all activities of its subsidiaries; (2) HNA representatives, acting on behalf of GCS, represented that they had the financial backing of HNA in chartering the M/V Daphne through a PowerPoint prospectus; (3) HNA provided cash injections into its subsidiaries unless, as in the case of GCS, they did not perform as hoped; (4) all Defendants routinely pay off and guarantee each other's debts using HNA Group controlled funds; (5) HNA is the beneficial majority owner of OHT and OHT Eagle; (6) GCL is the 60 percent owner of OHT; (7) HNA installed directors on OHT's Board who are directors of other HNA subsidiaries; (8) HNA treats OHT as it has its other subsidiaries; (9) HNA's subsidiaries are undercapitalized; and (10) HNA funded GCL's purchase of OHT by using funds otherwise available to satisfy the M/V Daphne charter hire. In addition, Plaintiff argues that subsequent to attachment of the M/V Eagle in this action, OHT underwent a restructuring that essentially stripped it of its only valuable assets–four vessels it

had owned through its subsidiaries, including OHT Eagle. According to Plaintiff, this restructuring was an attempt by GCL to evade its creditors by shifting assets into the hands of a third party. Although Defendants OHT and OHT Eagle do not address whether GCS, GCL and HNA are operating as alter egos, they deny that OHT and OHT Eagle are the alter egos of any of the Chinese defendants.

The evidence revealed in discovery shows that OHT and OHT Eagle do not constitute an alter ego of HNA and GCL for the purposes of sustaining attachment. First, there is no evidence to support Plaintiff's contention that HNA and GCL dominated or controlled OHT. The Fifth Circuit has explained that courts should assess the following nonexclusive factors in determining whether one company dominates or controls another: (1) common stock ownership; (2) shared officers and directors; (3) the parent financing the subsidiary; (4) undercapitalization of the subsidiary; (5) the parent paying the subsidiary's expenses; (6) the subsidiary receiving business through its parent; (7) commingling of property between the parent and subsidiary; (8) commingling of daily operations; and (9) failing to observe corporate formalities. Oxford Capital Corp. v. United States, 211 F.3d 280, 284 n.2 (5th Cir. 2000) (per curiam) (citing Century Hotels, 952 F.2d at 110 n.5).

Here, many of these factors are absent. Although GCL maintained a 60 percent ownership interest in OHT, and three of the five directors sitting on OHT's board were GCL appointees, these ties appear to be the extent of the relationship between the two companies. For instance, as Defendants point out, pursuant to the Shareholders' Agreement as well as

9

Norwegian law, OHT's minority shareholder–Songa Shipping and Trading, Ltd. ("Songa")[2]–was able to restrict GCL's control so that complete dominion by GCL was impossible. (D.E. 56, at 8). Specifically, the Shareholders' Agreement required that any corporate decision made by quorum must have included at least one Songa director. (D.E. 56-1, at 3). In addition, for certain corporate decisions–"qualified decisions"–at least one Songa director had to vote in favor of a particular resolution. Id. Qualified decisions included most major corporate changes as well as borrowing and lending transactions over $1.5 million. Id. Furthermore, the Norwegian Limited Companies Act, and its concept of "Negative Control,"[3] functionally barred GCL's complete control of OHT, absent allegations that GCL controlled Songa and its directors. (D.E. 56, at 18-19).

In addition, although GCL was able to appoint three of the five directors to OHT's board, the two companies only share one common director.[4] (D.E. 62, at 4). Moreover, GCL and OHT do not share any common business departments. Plaintiff argues to the contrary, noting that in a recent case based on similar alter ego allegations HNA paid a settlement on behalf of OHT. However, Plaintiff has failed to establish how such payment supports its alter ego theory. As Defendants explain, HNA and GCL paid the settlement because they acknowledged that OHT

---

[2] Songa is the wholly owned subsidiary of Spencer Energy AS ("Spencer"), which is owned by Arne Blystad. (D.E. 56, at 7-8; D.E. 56-3, at 29). Spencer was the 100 percent owner of OHT prior to GCL's acquisition. (D.E. 56-1, at 2).

[3] See Norwegian Limited Companies Act, sections 5-18 through 5-21. Negative Control provides baseline protections for minority shareholders that own over one third of a limited company by preventing majority shareholders from making certain corporate decisions without the minority's consent.

[4] There appears to be some confusion about the identities of OHT's board members. Plaintiff contends that two of the three OHT directors appointed by GCL were also part of GCL and HNA management. (D.E. 51, at 13). Defendants respond that Plaintiff erroneously identifies one of these directors, Mr. Wen Jiang, as the Vice Chairman of HNA's Board of Directors. (D.E. 62, at 4). In fact, HNA's Vice Chairman is an individual named Wang Jian. Id. Mr. Wen Jiang is a Vice President, but non-executive officer, with GCL. Id.; (D.E. 27-1, at 4).

was not responsible for their debt. (D.E. 62, at 5).

Plaintiff does not argue that Defendants consolidated financial statements, and evidence revealed in discovery shows the opposite. Id. at 6. Similarly, there is no evidence that GCL financed OHT, caused its incorporation, paid its expenses, or that the two companies sent each other business. Id. at 6. In addition, even if HNA provided inadequate capital to its subsidiaries GCL and GCS, Plaintiff does not allege that OHT was undercapitalized. GCL did not use OHT's property as its own and the daily operations of the corporations were entirely separate. In regards to this factor, Plaintiff attempts to argue that the OHT directors all used the same email stem, "hnair," and had a common internet name server address, "ns1.hnair.com" and "ns2.hnair.com." (D.E. 51, at 9). However, as Defendants point out, this allegation is only true as to GCL's OHT directors and affiliates, and therefore it establishes a connection between GCL and HNA, but nothing more. (D.E. 62, at 8; D.E. 51-3, at 31-36). Similarly, there is no evidence that OHT did not observe corporate formalities. To the extent Plaintiff suggests that OHT's restructuring subsequent to this action suggests as much, this argument is unfounded.

Second, in addition to the lack of evidence indicating GCL's dominion and control over OHT, discovery revealed nothing to suggest that HNA and GCL used OHT to perpetuate a fraud or injustice on Plaintiff. One of the few pieces of evidence that Plaintiff puts forth in this regard is the fact that GCL acquired a 60 percent interest in OHT in September 2010. It argues this transaction amounts to a shell game because GCL should have used those funds to pay the debts of its subsidiary GCS. Despite Plaintiff's contentions, the fact that GCL acquired an interest in OHT, standing alone, does not suffice to show fraud or injustice for the purposes of establishing that OHT was an alter ego. Furthermore, its allegations regarding GCL's representations in its

PowerPoint prospectus do not relate to or include <u>any</u> mention of OHT.

Finally, to the extent Plaintiff relies on OHT's corporate restructuring subsequent to attachment as proof of either domination and control or fraud and illegality, there is no evidence showing that the restructuring was anything more than an attempt by OHT to stay financially solvent in the wake of various attachment proceedings arising from its relationship with GCL. Specifically, after the attachment of M/V Eagle, OHT's board of directors resolved to post security for release of the vessel. (D.E. 51, at 15-16). GCL then executed security agreements with OHT and OHT Eagle to set off the costs of the bond, a potential judgment, and legal costs that would be incurred in this action. <u>Id.</u> at 16. On April 27, 2012, Songa exercised its "put option" pursuant to the Shareholders' Agreement, which obligated GCL to purchase Songa's 40 percent interest. <u>Id.</u> GCL, however, failed to buy Songa's shares, giving rise to a dispute between the two OHT shareholders that is currently in arbitration. <u>Id.</u>; (D.E. 56-3, at 14-18).

Meanwhile, around this same time, OHT failed to make payments on its Term Loan Facility with Credit Agricole Corporate and Investment Bank. (D.E. 51, at 16). It was able to secure a short extension on its loan in exchange for a modification of its security agreement, whereby Credit Agricole was given a security interest in the shares and inter-corporate loans of OHT's subsidiaries, including OHT Eagle. (D.E. 51, at 17; D.E. 62, at 9). Ultimately, despite this extension, OHT was unable to satisfy its debt, and Credit Agricole foreclosed on its security interest. (D.E. 51, at 17). The bank then sold these assets to Albatross Investering AS, a company owned by Arne Blystad. <u>Id.</u>

Plaintiff contends that the foreclosure amounts to "deliberate and planned manipulation" by GCL. <u>Id.</u> at 18. In particular, it insists that the minutes from OHT's board meetings prior to

the restructuring, as well as Arne Blystad's deposition testimony, establish GCL's fraudulent motivations and therefore prove an alter ego relationship. However, a careful review of this evidence shows that the restructuring was wholly independent from GCL. For example, during a May 4, 2012 board meeting addressing OHT's loan obligations to Credit Agricole, one of OHT's directors concluded that due to GCL's financial difficulties, and as long as GCL is a majority shareholder, no western or United States banks would be willing to finance the company nor would it be able to obtain a loan. (D.E. 51-5, at 9). When asked about this comment, Arne Blystad testified in his deposition that OHT's reputation in the shipping market was damaged as a result of its affiliation with GCL, and that banks therefore were hesitant to offer financing that it needed to stay afloat. (D.E. 58-1, at 31). This explanation does not establish that GCL dominated or controlled OHT or that OHT's restructuring was fraudulent. Moreover, both the board meeting records and Arne Blystad's testimony suggest that OHT, GCL, Songa, Credit Agricole, and Albatross were all operating at an arm's length throughout the restructuring. In sum, the evidence cited by Plaintiff falls well short of establishing an alter ego relationship between OHT and GCL, and the alter ego allegations are otherwise conclusory and unsubstantiated.

Given the overwhelming lack of evidence that HNA and GCL dominated or controlled OHT and that it used OHT to perpetuate a fraud or injustice on Plaintiff, it is clear that OHT is not the alter ego of HNA and GCL. Therefore, Plaintiff has not established a *prima facie* admiralty claim against OHT and OHT Eagle sufficient to satisfy its burden pursuant to Rule E. Accordingly, it is respectfully recommended that attachment be vacated.

### C. Defendants Are Entitled To Dismissal.

Plaintiff has not alleged facts sufficient to sustain attachment of the M/V Eagle pursuant to Rule B. Therefore, because the property that formed the basis of this action is no longer subject to attachment, this Court no longer has jurisdiction for the purposes of Rule B or § 8 of the Federal Arbitration Act. See Sembawang Shipyard, 955 F.2d at 987; Great Eastern Shipping, 631 F. Supp. 2d at 396. Accordingly, it is respectfully recommended that Plaintiff's action be dismissed.

## V. RECOMMENDATION

Based on the foregoing, it is respectfully recommended that Defendants' amended motion to dismiss and to vacate attachment, (D.E. 56), be granted, that attachment, (D.E. 7), be vacated, and that Plaintiff's complaint, (D.E. 1), be dismissed.

Respectfully submitted this 28th day of March 2013.

_____
BRIAN L. OWSLEY
UNITED STATES MAGISTRATE JUDGE

**NOTICE TO PARTIES**

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel. Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to 28 U.S.C. § 636(b)(1); Rule 72(b) of the Federal Rules of Civil Procedure; and Article IV, General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415 (5th Cir. 1996) (en banc).